E-FILED
Friday, 10 August, 2018  08:01:17 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

GRACE GILFILLAN,

        *Plaintiff*,

    v.

BRADLEY UNIVERSITY,

        *Defendant*.

Case No.:  1:18-cv-01297-MMM-JEH

## AMDENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff GRACE GILFILLAN ("Plaintiff" or "Ms. Gilfillan"), by and through her undersigned attorney, and hereby complains and alleges against the above-named Defendants, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

## INTRODUCTION

Ms. Gilfillan seeks damages and injunctive relief to remedy violations of her rights secured by the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA"), and for breach of contract by BRADLEY UNIVERSITY ("BU") in relation to the wrongs she suffered.

Ms. Gilfillan tolerated pervasive discrimination and retaliation after she disclosed her disability and sought reasonable accommodations while enrolled in BU's Doctor of Physical Therapy ("DPT") program.  BU repeatedly failed to provide the reasonable accommodations to which she was entitled, negatively impacting Ms. Gilfillan's ability to participate in the program and academically perform.  BU then penalized Ms. Gilfillan for the negative outcomes caused by BU's refusal to accommodate and subjected Ms. Gilfillan to targeted hostility and discriminatory

treatment. Further, DPT program faculty penalized and retaliated against Ms. Gilfillan for requesting, utilizing, and discussing her need for accommodations and the impact of her disability and prevented her from participating in activities of the program on the basis of her disability. BU then wrongfully dismissed her in violation of its own policies and in breach of its contract with Ms. Gilfillan. Accordingly, she now petitions this Court for redress in the form of injunctive relief, damages, costs and reasonable attorney's fees in relation to the violation of her rights, as well as damages for breach of contract pursuant to Illinois common law.

<strong><u>PARTIES</u></strong>

1.     Plaintiff, GRACE GILFILLAN, is a citizen of Illinois and at all times relevant herein was a student at Bradley University.

2.     Defendant, BRADLEY UNIVERSITY, has its principal place of business in Illinois.

3.     At all times relevant hereto, and in all the actions described herein, Defendant's actions took place in the State of Illinois.

<strong><u>JURISDICTION</u></strong>

4.     This Court has jurisdiction over the claims set forth in this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights), as there exist claims based upon 42 U.S.C. §§ 12101-12213 and 29 U.S.C. § 701, *et seq*.

5.     Supplemental jurisdiction over Ms. Gilfillan's pendant state law claims are proper pursuant to 28 U.S.C. § 1367(a), as there exist claims arising out of the same transaction and occurrence as her federal claims.

6.     Venue in this jurisdiction is proper pursuant to 28 U.S.C. § 1391(b), as BU is located in this District, and all of the events giving rise to Ms. Gilfillan's claims occurred therein.

7.      All conditions precedent to the maintenance of this suit and Ms. Gilfillan's claims have occurred, been performed or otherwise waived.

## GENERAL FACTUAL ALLEGATIONS

8.      Ms. Gilfillan entered BU's DPT program as a non-traditional student in the summer of 2015.

9.      Ms. Gilfillan suffers from Fibromyalgia, Major Depressive Disorder ("MDD"), Generalized Anxiety Disorder ("GAD"), Obsessive Compulsive Disorder ("OCD") and Attention Deficit Hyperactivity Disorder ("ADHD").

10.      Without mitigating measures, these impairments substantially limit a number of major life activities, including concentrating, memory, learning, reading, thinking, stress management, organization, prioritization and management of internal and external distractions.

11.      Without mitigating measures, these impairments additionally impair Ms. Gilfillan's social interactions, self-care, class attendance, the keeping of appointments, and sleeping, and cause her to require additional time to complete tasks and at times suffer from fatigue, ongoing pain, and substantial anxiety.

12.      Nonetheless, despite these disabilities, Ms. Gilfillan successfully completed an undergraduate degree in Art and maintained a career as an independent photographer before taking an interest in health related positions and deciding to pursue a doctorate in physical therapy.

13.      BU's DPT program requires that applicants demonstrate both academic and non-academic success in all areas the program considers essential for physical therapists and more than 400 students typically compete for only twenty four spots, leading to an average acceptance rate of 11%.

14.     Prior to entering the DPT program, Ms. Gilfillan completed more than two years of demanding prerequisite coursework in the sciences, including physics, chemistry, biology, anatomy and physiology, and statistics.  Ms. Gilfillan earned almost all As, making the President's and Dean's list in several semesters, and serving as a tutor for other students in the most challenging classes, while engaging in a range of non-academic activities including those that provided exposure to health care settings.

15.     As a result, Ms. Gilfillan met the demanding admission standards of the DPT program and was offered a space in the cohort beginning in the 2015-2016 school year.

16.     After entering the DPT program, Ms. Gilfillan performed well academically, maintaining a 3.0 GPA through her first year and a half.

17.     During that period, however, her conditions were exacerbated and she began to experience increasing symptoms for which she sought treatment.

18.     Ms. Gilfillan began working with BU's Health Services and Counseling to manage her symptoms in the Spring of 2016.

19.     At her counselor's suggestion, Ms. Gilfillan also began working with BU's then named Center for Learning and Access ("CLA") to obtain necessary accommodations for her disability.

20.     To obtain accommodations, students must submit documentation of their disability and information regarding needed accommodations, as well as meeting with the director of the CLA.

21.     The CLA then approves accommodations for the student and issues a notification letter to instructors so that they are aware of the accommodations they are required to provide.

22.     On April 22, 2016, Ms. Gilfillan's mental health counselor at BU, Lisa Fix-Griffin, completed a CLA form to certify Ms. Gilfillan's conditions and need for accommodations.

23.     Ms. Fix-Griffin noted that Ms. Gilfillan's diagnoses of MDD and ADHD had been confirmed by BU providers in July 2015 and February 2016, but that the MDD at least had been previously diagnosed prior to BU.

24.     Ms. Fix-Griffin affirmed that these impairments substantially limited the major life activities of concentrating, memory, learning, reading, thinking, stress management, organization, prioritization and management of internal and external distractions.

25.     These impairments were noted to additionally impair Ms. Gilfillan's social interactions, self-care, class attendance, the keeping of appointments, and sleeping.

26.     With respect to the academic setting, Ms. Fix-Griffin noted that sustained concentration for note-taking would be impaired, as would organization and prioritization skills, and that Ms. Gilfillan required more time to work through tasks.

27.     Ms. Fix-Griffin specifically recommended assistance with note-taking, extended deadlines, a quiet atmosphere and extended time for tests as accommodations, as well as alternatives for course completion through content application past semester deadlines, through incomplete status.

28.     Ms. Fix-Griffin faxed the CLA form to the CLA on April 25, 2016.

29.     On April 28, 2016, Ms. Gilfillan completed the CLA's Request for Disability Services and Accommodations ("Accommodation Request") form.

30.     On the Accommodation Request form, Ms. Gilfillan noted she had both a psychological condition and ADHD, which impaired her ability to care for herself, sleep, learn, read, concentrate and think.

31.     Ms. Gilfillan noted that distractibility and difficulty prioritizing, namely in staying on schedule for long term assignments, were concerns and areas impacted, and that she had difficulty understanding large quantities of text at one time.

32.     On the Accommodation Request form, she specifically requested the recording of lectures, assistance with note taking, extended deadlines, a quiet environment and/or extended time for tests.

33.     Following BU procedure, Ms. Gilfillan met with the Interim Director of the CLA, Lynne Branham, on April 28, 2016 to discuss her request.

34.     Prior to this meeting, Ms. Gilfillan had not known anything about the accommodations available to students, and relied heavily on the information provided by Ms. Braham.

35.     During the meeting, Ms. Gilfillan provided her Accommodation Request form, and discussed her difficulty with concentration, particularly with reading and short term memory, and requested assistance for her challenges with prioritization and management of her workload.

36.     Ms. Gilfillan also provided a release for the CLA to contact the BU counseling center so that they would have access to information about all of her diagnoses and disabilities, not just the MDD and ADHD, to assist her in determining the necessary and appropriate accommodations.

37.     Despite Ms. Fix-Griffin and Ms. Gilfillan's specific notes that Ms. Gilfillan's disabilities impaired her ability to prioritize and organize, and Ms. Gilfillan's specific request for assistance, Ms. Branham told Ms. Gilfillan that they would not assist her in any way with organization and prioritization of tasks.

38.     Nor did the CLA agree to provide the recommended accommodation of extended deadlines or alternatives for course completion including content application and incompletes.

39.     Instead, Ms. Branham told Ms. Gilfillan that she was eligible only for note-taking assistance, recorded lectures, and increased exam time.

40.     At the time, the CLA was disorganized and information available to students about the possible supports was lacking.

41.     Ms. Gilfillan therefore left the meeting with Ms. Branham unaware of both the range of potential accommodations and BU's obligation to provide them, believing what Ms. Branham had told her – there simply were no accommodations in some areas and in others, Ms. Gilfillan was not "eligible."

42.     Towards the end of the Spring 2016 semester, Ms. Gilfillan took incompletes in her classes in order to enter a partial hospitalization program to treat her MDD and GAD.

43.     At this point, the DPT program suggested that she "step-out" of the program; however, no student had ever stepped out and returned to the program, and per BU policy, readmission is not guaranteed.

44.     Ms. Gilfillan declined to leave and through her incompletes, was able to complete the semester with her cumulative GPA at 3.02.

45.     During the summer of 2016, Ms. Gilfillan completed her first clinical experience.

46.     Students in the DPT program are matched to clinical placements based on their listed choices, their clinical interests, and placement availability.

47.     Ms. Gilfillan was matched to a site in Macomb, Illinois, in a setting similar to those she had listed as preferences.

48.     Following matching, Ms. Gilfillan researched the location and associated professionals and found housing.

49.     When she met with Dr. Priscilla Weaver, the Director of Clinical Education, about the placement following her completion of treatment, Dr. Weaver asked if she had any concerns about the placement and Ms. Gilfillan informed her that, on the contrary, she was excited about the placement and had made preparations.

50.     However, rather than permit her to go to her matched clinical site, the DPT faculty believed it would be in Ms. Gilfillan's best interests to stay in the Peoria area because of her disabilities.

51.     Dr. Weaver therefore changed Ms. Gilfillan's placement to a site not on the DPT program's original list, in Chillicothe.

52.     The Chillicothe placement was comparably worse than the placements offered to other students and the initial placement offered to Ms. Gilfillan.

53.     The clinical instructor focused on treating patients with spinal pathologies, an area that had not yet been covered in the DPT program and thus an area in which first year students such as Ms. Gilfillan would be limited in their participation.

54.     Further, the Chillicothe clinic was very slow, with few patients, precluding Ms. Gilfillan from obtaining the same daily patient exposure that she would have obtained in other placements.

55.     Ms. Gilfillan learned about accommodations effectively utilized by other students during their clinical experiences with needs similar to hers, including extended time for documentation or a scribe to assist with documentation.

56.     However, when Ms. Gilfillan suggested these accommodations to Dr. Weaver, Dr. Weaver expressed concern that the accommodations would be difficult to provide.

57.     Dr. Weaver later informed Ms. Gilfillan she was concerned about Ms. Gilfillan's performance in clinic and Ms. Gilfillan's progress was limited by her failure to demonstrate the ability to complete evaluations and treatments without additional time.

58.     Dr. Weaver additionally expressed concern that Ms. Gilfillan took longer than expected to perform some assignments and required additional time to complete her documentation, believing her performance to be deficient.

59.     However, during her clinical placement, Ms. Gilfillan's skill development mirrored that expected of students, as explained to the cohort by Dr. Weaver.

60.     Further, Ms. Gilfillan met the expectations for students at the end of her clinical experience.

61.     Until the summer of 2016, Ms. Gilfillan was also class president for her cohort, a position which facilitated the sort of social integration with her peers normally made so difficult by her MDD and GAD.

62.     The position provided a source of motivation to Ms. Gilfillan and a sense of belonging with her cohort and peers.

63.     However, after Ms. Gilfillan requested accommodations, took incompletes and sought treatment for her conditions, Dr. Steven Tippett, program chair, in conjunction with Dr. Weaver, Dr. A.J. Strubhar, professor, and Dr. Bre Reynolds, research supervisor, decided that it would be in Ms. Gilfillan's best interests to remove her as class president to reduce her non-academic responsibilities and the outside stressors in light of her recent report of disability symptoms and need for additional time to complete coursework while undergoing treatment.

64.     This decision was made despite Ms. Gilfillan's successful completion of her Spring coursework following her treatment and her successful completion of her clinical experience.

65.     Neither Ms. Gilfillan nor the CLA were consulted prior to the DPT program removing Ms. Gilfillan from her position as class president because of her disability and the concern about her limitations.

66.     Rather, Ms. Gilfillan was simply informed of the decision, after another student had already been chosen to replace her.

67.     Starting in Fall 2016, Ms. Gilfillan was additionally granted the accommodations of utilizing alternative formats for text, including e-text and text to speech software, though neither Ms. Gilfillan nor her professors were made aware.

68.     However, despite what Ms. Gilfillan was told in her meeting and further exchanges with Ms. Branham, and in keeping with the disorganization of the office, when notices were sent to Ms. Gilfillan's professor regarding her accommodations in the Fall of 2016, only the ability to record lectures and have extended time on the exam were included.

69.     Confusingly, "auditory format" for testing was also marked, but alternative format texts including e-text and text to speech and note-taking assistance were not included.

70.     In Spring 2017, "auditory format" for testing was removed from the instructor notification, and a distraction free environment for testing was added, but alternative format texts and note-taking assistance were still absent from the notification.

71.     At the end of the Fall 2016 semester, though Ms. Gilfillan's cumulative GPA remained above a 3.0, Ms. Gilfillan was informed she would be required to remediate two prior courses in Spring 2017 because she had received Cs.

72.     These courses had been completed at a time when Ms. Gilfillan had not received all of the accommodations to which she was entitled.

73.     One of the courses, Neurological PT I, had been completed in Spring 2016, and Ms. Gilfillan had subsequently completed Neurological PT II, the second part of the course, with a B.

74.     Under DPT program policy, at the end of any semester in which a student earns a "C," the student should receive notification of an academic concern and direction to work with the faculty of the course to develop a plan of remediation.

75.     Ms. Gilfillan did not receive such a notice at the end of the Spring 2016 semester.

76.     Nonetheless, she was required to remediate the first part of Neurological PT and the program's delay in informing her meant that rather than have the summer to remediate, Ms. Gilfillan was required to perform additional work on top of an already full course load during the Spring 2017 semester.

77.     Despite completing the required remediation, that remediation was not applied to her grades in the relevant courses.

78.     In addition to remediation, Ms. Gilfillan was assigned additional tasks because of her medical absences.

79.     In Spring 2017, after pulling Ms. Gilfillan aside after class and confronting her with questions about her commitment to the program, the course professor Dr. Joe Kelly and Dr. Reynolds gave her an assignment not given to her peers because she had been absent.

80.     Ms. Gilfillan asked to retrieve her notebook to write down the assignment requirements, but she was denied the opportunity, and was instead told by Dr. Kelly and Dr. Reynolds that the assignment was not that involved.

81.     The assignment was given during the week of exams, so Ms. Gilfillan asked for the assignment deadline to be extended through the weekend to give her the time necessary to focus on it.

82.     Dr. Kelly and Dr. Reynolds denied her request and again told her the assignment was not that involved.

83.     When she turned in the assignment, however, Dr. Kelly demanded that she orally present what she had learned.

84.     When Ms. Gilfillan's anxiety rose as a result of the sudden demand and she became flustered, Dr. Kelly stated that he believed she had not read the articles and again told her she wasn't committed to her learning.

85.     Dr. Reynolds then joined the discussion, and Ms. Gilfillan emphasized her commitment and noted that the assignment instructions had not been clear.

86.     Dr. Kelly then asked her why she hadn't asked for clarification and she cited her refused request to get her notebook to write down instructions in detail and to have extended time.

87.     She also noted that Dr. Kelly had previously told her he would not check or respond to any emails outside of his time on campus.

88.     Dr. Kelly continued to berate her, accusing her of not taking responsibility and lacking commitment to the program because of her reference to her need for and his refusal of accommodations.

89.     Ms. Gilfillan felt so shamed and humiliated she fell silent, with tears on her face, until Dr. Kelly dismissed her by saying, "You can leave."

90.     Nonetheless, when Ms. Gilfillan sent a follow up email in an attempt to clarify Dr. Kelly's expectations for the assignment, he again told her he didn't believe she had read the articles and accused her of avoiding accountability.

91.     When Ms. Gilfillan sent a second email in an attempt to get clarity, she received no reply.

92.     None of the extra articles or other assignments containing reading material, in this or other instances, were provided in electronic text format, readable by her text to speech software, meaning that Ms. Gilfillan had to take even longer to read the material than she would have otherwise.

93.     Then, on April 3, 2017, Ms. Gilfillan was called into a meeting with Dr. Tippett and Dr. Weaver, purportedly to discuss "non-professional behavior" and academic concerns.

94.     As relayed by Dr. Tippett, the non-academic concerns included missed class periods, tardies and early departures, missed clinic hours, missed meetings for research and late responses to emails.

95.     During the semester, Ms. Gilfillan had missed several classes due to illness, medical appointments and treatment, and had provided the required notice on each occasion.

96.     Further, Ms. Gilfillan had provided advanced notice of potential tardies because the psychiatrist on campus, necessary to treat her disabilities, was only available on Wednesdays at 8:30, causing her to be late to her 9 am class.

97.     Ms. Gilfillan had missed one clinic date for illness and on the other date Dr. Tippett identified as missed, mandatory clinic had not even been held.

98.     Ms. Gilfillan also sometimes required additional time to respond to emails because of her physical and mental health disabilities.

99.     Ms. Gilfillan had once been late to a phone call with Dr. Weaver, because Dr. Weaver's request for a call had come in the middle of another task and due to her ADHD and short term memory difficulty, she did not write down the time and briefly forgot.

100.    Ms. Gilfillan explained the connection between each of these concerns and her disabilities and related needs.

101.    She also explained her attempts to get assistance and accommodations through the CLA and BU's failure to provide any assistance or accommodation in the areas of time management and prioritization.

102.    Dr. Tippett and Dr. Weaver faulted Ms. Gilfillan for having failed to disclose all of her needs to her professors, though she had followed BU procedures in obtaining accommodations through the CLA.

103.    Further, Dr. Tippett dismissed her explanation of her disabilities and need for accommodation as rationalizations and failing to take responsibility or making excuses.

104.    Dr. Tippett then informed her that her disability related need for accommodations – missed classes, tardies for necessary appointments and additional time to respond to emails – were professional behavior issues that detracted from her learning and negatively impacted her classmates.

105.    Dr. Tippett also asked her to explain how she would remedy these needs, which he called "deficiencies."

106.    When Ms. Gilfillan requested to have additional time to respond, Dr. Tippett faulted her for being unable to respond in the moment.

107.    A follow up meeting was held on April 13, 2017, during which time Ms. Gilfillan shared more details regarding her needs, treatment and efforts, including that her medications were

14

being adjusted and that she had arranged on her own for an academic counselor to assist her in working on time management issues.

108.    Dr. Tippett again emphasized that Ms. Gilfillan needed to share even more information about her disability, needs and treatment with the DPT program faculty and though he indicated he was pleased with her proactive efforts to obtain additional assistance, informed her that he would be sending her a formal notice of the non-academic concerns discussed in the meetings.

109.    On April 20, 2017, Dr. Tippett sent notification that Ms. Gilfillan had been placed on warning for "non-professional behaviors" for the perceived problems discussed during the April 3 and April 13, 2017 meetings.

110.    The notification requested a response describing how she intended to rectify the "behavior" discussed in the meetings and her understanding of the ramifications if she did not.

111.    Along with the letter, Dr. Tippett included his notes from the two meetings.

112.    In the notes of the April 3, 2017 meeting, Dr. Tippett recorded his belief that Ms. Gilfillan did not understand the "significant impact" her disabilities would have on her ability to complete the program and obtain and maintain employment.

113.    Dr. Tippett also expressed his or the faculty's hope that Ms. Gilfillan "will independently come to the realization that her current mental health (and impact on her physical health) may be an obstacle that she cannot overcome at this time and perhaps in the future."

114.    Faculty in the DPT program routinely excused class and clinic absences, explicitly approving of absences for program related activities and informed students in clinical experiences that they can tack days missed for illnesses or family issues onto the end of the session.

115.    Not surprisingly, in light of Ms. Gilfillan's need for extended time and other accommodations, the imposition of additional work above and beyond the workload carried by all other students and the DPT programs ongoing hostility, lack of support, and expectation that she "remedy" the "deficiency" of her disability and need for accommodations negatively impacted Ms. Gilfillan's performance.

116.    It was only at this point, after the DPT program subjected Ms. Gilfillan to more work than her peers, to be completed within the same time, despite her need for accommodations and additional time, that Ms. Gilfillan' academic performance declined such that her GPA dipped to a 2.94, below the minimum 3.0.

117.    At the end of the Spring 2017 semester, Ms. Gilfillan was also informed that she would not be permitted to present the research paper on which she and her partner had worked.

118.    Research presentations at national conferences are valuable experiences in the field and an expected part of doctoral graduate study.

119.    Ms. Gilfillan began working with this partner on the research in Fall 2015.

120.    Ms. Gilfillan explained her requirements as a student with a disability to her partner, and her need for a bit more time to complete tasks, and worked with her partner to divide the project into individual responsibilities to permit her to work on the needed timeline.

121.    However, though Ms. Gilfillan completed the work on her part, her partner continually completed and submitted the entire assignment well in advance of the due date, because she did not want to wait.

122.    As a result, Ms. Gilfillan received no credit for her work and was deprived of the opportunity to participate fully in the research activities.

123.     Ms. Gilfillan informed Dr. Reynolds of these difficulties during the spring of 2016, explaining that she was not being given a chance to contribute what she had worked on prior to her partner turning the assignments in.

124.     Ms. Gilfillan's partner acknowledged that this was occurring.

125.     Nonetheless, Dr. Reynolds told Ms. Gilfillan that she was stuck with her research partner, and no effort was made to address the situation.

126.     As a result of Dr. Reynolds' failure to intervene, Ms. Gilfillan's official credit for the research project was minimal.

127.     It was this supposed failure to contribute, borne directly from the DPT program's failure to ensure Ms. Gilfillan had appropriate accommodations and time to complete assignments that resulted in the Dr. Reynolds' determination that Ms. Gilfillan did not deserve to present the research project at the national conference and that that honor and experience would go solely to her partner.

128.     This vicious cycle of the DPT program's failure to provide the required accommodations and undermining of Ms. Gilfillan's success resulting in weaker academic performance, after which the DPT program required Ms. Gilfillan to do even more work with even fewer accommodations, continued after the Spring 2017 semester.

129.     As a result of Ms. Gilfillan's decline in GPA, she was put on academic probation and required to meet with the Graduate Student Retention Committee ("Retention Committee").

130.     Under the BU Graduate School Dismissal policy, students on academic probation are provided two semesters to bring their GPA up to a 3.0.

131.    Under the DPT program Academic Dismissal policy, Ms. Gilfillan was to receive notification of her hearing with the Retention Committee, along with the course of action that may be taken by the faculty.

132.    The Academic Dismissal policy provided that the Retention Committee was to determine one of five courses of action:  (1) remediation, (2) retaking the courses causing the below 3.0 GPA, (3) sitting out a year and retaking the courses or repeating an entire semester, (4) voluntary withdrawal or (5) dismissal.

133.    The notification that Ms. Gilfillan received from Dr. Tippett did not include the course of action that might be taken by the faculty in Ms. Gilfillan's case.

134.    The notification did, however, inform Ms. Gilfillan that she would not be permitted to take part in the second clinical experience, a course of action not permitted by program policies.

135.    The notification further informed Ms. Gilfillan that, contrary to Graduate School policy permitting two semesters, Ms. Gilfillan would be provided only one semester to raise her GPA.

136.    As part of the meeting with the Retention Committee, Ms. Gilfillan was required to develop a plan for remediating the classes in which she earned a poor grade or otherwise propose a course of action to address the deficiency.

137.    Ms. Gilfillan prepared a detailed plan of remediation with several options that would enable her to address any concerns regarding her content knowledge while avoiding the additional workload that had been imposed previously.

138.    Ms. Gilfillan noted that stepping out would not be ideal, as it would likely lead to a loss of skills or knowledge.

139.    Ms. Gilfillan presented a plan to conduct remediation of the courses over the summer months, as well as attend the same clinic hours as other students, but in the role of an observer in order to keep her skills fresh.

140.    Remediation over the summer would ensure that she had her full time to focus on the normal courses during the Fall semester in order to improve her GPA.

141.    Further, this plan for remediation aligned with DPT's standard policies providing for remediation of course work in the semester following the deficiency.

142.    As the DPT program was year round, the summer semester was the standard semester in which to undertake remediation under the policy.

143.    Alternatively, Ms. Gilfillan identified retaking the courses as the best action for GPA improvement.

144.    Ms. Gilfillan outlined a detailed sequence of course enrollments that would enable her to retake all courses in which she earned a C and continue her learning.

145.    Graduate school policies permit students to take up to five years to complete their degree.

146.    Ms. Gilfillan's plan would have enabled her to continue with the typical course load for DPT students, and put her on track to graduate after four rather than three years, well within the time limits for obtaining a degree.

147.    The DPT program's decision not to allow her to take the second clinical experience, which was typically only offered once a year in the summer, meant that her graduation would already have been delayed by up to year.

148.    Throughout her plan and her discussion with the Retention Committee, Ms. Gilfillan repeatedly noted that completing remediation on top of her Fall 2017 regular course load

was not workable given her needs, particularly as the program was only allowing her that single semester to raise her GPA.

149.     Despite the multiple alternative options Ms. Gilfillan offered, each of which was one of the options outlined in the DPT program's academic dismissal policy and each of which would meet her disability related needs while ensuring opportunities to review necessary courses, the Retention Committee rejected them all.

150.     Instead, Ms. Gilfillan was again required to conduct her remediation work on top of her full Fall 2017 course load.

151.     This recommendation of delaying remediation a semester not only failed to follow DPT program policy providing for remediation in the semester immediately following the deficiency, but also unnecessarily imposed a substantial burden on Ms. Gilfillan.

152.     The Retention Committee and the DPT program could have easily provided any of the approaches Ms. Gilfillan sought to accommodate her disability needs while addressing the program's concerns.

153.     As a result of the stress caused by the program's refusal to accommodate her and the hostile environment, Ms. Gilfillan's anxiety and depression were significantly exacerbated, requiring emergency care at one point.

154.     Despite the program's decision, some of the faculty in the program, including professors who had taught the courses in which Ms. Gilfillan was to complete remediation, were left with the understanding that Ms. Gilfillan was supposed to complete her remediation over the summer.

155.    Thus, when Ms. Gilfillan had not completed the remediation by the Fall, those professors believed that Ms. Gilfillan had chosen not to do so – had simply not cared to do so – and their view of Ms. Gilfillan's abilities and commitment was negatively impacted.

156.    One of those professors, Dr. Strubhar, was teaching one of Ms. Gilfillan's Fall courses.

157.    In July 2017, Ms. Branham was replaced by a permanent director, Ms. Elizabeth Gorman.

158.    Following Ms. Gorman's hiring, the CLA transitioned to the office of Student Access Services ("SAS") and began to utilize new software and systems for tracking accommodations.

159.    When Ms. Gilfillan met with Ms. Gorman, Ms. Gorman informed her that she qualified for additional accommodations.  It was the first time Ms. Gilfillan understood that she was entitled to any additional assistance beyond that Ms. Branham approved.

160.    In light of this additional information, Ms. Gilfillan again requested the same accommodations and supports as she had previously and that Ms. Branham had denied, including extended deadlines, alternatives to course completion beyond the standard course deadlines, and support for organization and task prioritization.

161.    Based on the same information previously provided to Ms. Branham and the CLA in April 2016, Ms. Gorman informed Ms. Gilfillan that she qualified for texts and assignments in the alternative format of an e-text, testing with extended time, a distraction free environment, and the use of text to speech software, note-taking services, and extra time for assignments.

162.    Unfortunately, despite the documentation Ms. Gilfillan provided and the recommendation of her counselor, the accommodation of extra time for assignments was not

provided for all assignments or the course as a whole but was instead left to professor discretion, and could be refused by any professor for any reason.

163.    Furthermore, though Ms. Gorman explained that BU provided "academic coaching" as an accommodation for students with difficulties with organization and prioritization, such as the difficulties Ms. Gilfillan experienced, BU would not provide that accommodation to Ms. Gilfillan because she was in a graduate program.

164.    Ms. Gorman did not provide any other basis for BU's refusal.

165.    Colleges and universities routinely provide academic coaching or similar supports to students with organizational and prioritization difficulties at both the undergraduate and graduate level in a wide variety of programs, facing little difficulty in including this service in their range of accommodations.

166.    Because of her unfamiliarity with potential accommodations and BU's failure to accurately explain its obligations, Ms. Gilfillan was initially unaware that academic coaching existed and then unaware that academic coaching should have been available to her even as a graduate student.

167.    Following SAS's notification to faculty of her approved accommodations in Fall 2017, Ms. Gilfillan emailed the faculty herself to suggest ways in which the accommodations might be implemented in her courses, invited them to ask questions and requested assistance in approaching students as potential note takers.

168.    Dr. Tippett was the only professor who responded to her communications about accommodations, and he responded only to tell her not to bother asking for any extended deadlines in the program because they would not be granted.

169.    Indeed, when professors felt that Ms. Gilfillan did not request extended time soon enough for their liking or she shouldn't need it, they refused her that accommodation.

170.    Professors consistently refused to grant Ms. Gilfillan extended deadlines on any assignment that appeared on the course syllabus or was otherwise discussed at the beginning of the semester based on their personal feeling that she should not need and should not receive such an accommodation.

171.    In the face of such explicit refusal, any further request for the accommodation seemed futile and Ms. Gilfillan stopped asking.

172.    Nonetheless such extensions were provided to other students.

173.    A few days after Ms. Gilfillan was told by Dr. Tippett that no extensions would be granted for her, another student requested an extension of a deadline and the deadline was pushed back for the entire class.

174.    That fall, SAS provided e-texts for any text book she purchased so that she could use text to speech software and the DPT program provided her with extended time and a distraction reduced environment for written exams, but only when Ms. Gilfillan reminded the professors of the required accommodation multiple times and was able to arrange a time and place to take the exam by herself.

175.    The DPT faculty refused her requests for extended time on most practical exams, however, because the faculty were too busy to give her the additional time.

176.    Ms. Gilfillan was able to record lectures, but though SAS confirmed in August 2017 that they would arrange a note-taker and Ms. Gilfillan reached out to professors herself to request assistance in locating a note-taker, Ms. Gilfillan received no response and SAS never provided the note taker.

177.    Ms. Gilfillan ultimately approached classmates herself, but though they agreed to provide notes, the classmates almost never provided her with any.

178.    The DPT faculty's negative view of Ms. Gilfillan's need for and sometimes use of accommodations was evident both in their refusal to grant those accommodations and in their reactions when Ms. Gilfillan made use of them.

179.    Ms. Gilfillan received substantial pushback even when she was permitted to utilize her accommodations as professors viewed Ms. Gilfillan's use of accommodations as her failing – or being unable – to perform under what they believed were real world work conditions.

180.    In one class, after Ms. Gilfillan had recorded a mock exam with a classmate as patient with that classmate's permission, the professor, Dr. Pam Durr, approached her to challenge her about recording class activities.

181.    Professor Durr further told her she would not have any such accommodations in the workplace, and she should consider whether to continue recording as Professor Durr felt the use of the accommodation did not provide a realistic environment.

182.    Contrary to Professor Durr's impression that Ms. Gilfillan was somehow completing class activities under less demanding conditions than she should, or that the use of accommodations meant Ms. Gilfillan was unable to make it in the real world, workplaces are required to and do provide accommodations for employees with disabilities, including recording, assistive technology or other supports.

183.    On October 11, 2017, Ms. Gilfillan met with the BU Ombudsman about the difficulties she was experiencing with the DPT program.

184.    When Ms. Gilfillan expressed her concerns about backlash from the DPT department for complaining, as she had received after her requests for accommodations or

assistance, the Ombudsman informed her that he could not do anything without identifying her to the program.

185.    Afraid that an official action would result in additional hostility and accusations, or worse another warning or dismissal for purported unprofessional behavior, Ms. Gilfillan declined to pursue a formal complaint with the Ombudsman.

186.    The Ombudsman then recommended that Ms. Gilfillan contact Dean Joan Sattler, Dean of the College of Education and Health Sciences.

187.    Ms. Gilfillan met with Dean Sattler on October 25, 2017, and explained her need for accommodation and told the Dean about her about her difficulty getting the DPT program to agree to provide those accommodations, including to extend deadlines, and the hostility she was experiencing from the department.

188.    Ms. Gilfillan told the Dean that she was capable of doing everything her peers could do, it simply took her a little longer and this should not keep her from earning her degree or being a successful professional.

189.    Ms. Gilfillan told Dean Sattler that her requested outcome was that she be permitted to retake courses to improve her GPA, including the courses that would be offered in the spring and also expressed her frustration that her prior remediation efforts, though satisfying what the department had asked, had not been applied to her grades.

190.    Dean Sattler suggested a change of advisor given Dr. Reynolds treatment of Ms. Gilfillan, with which Ms. Gilfillan agreed.

191.    The DPT program ultimately made the change, but recorded that the change was not done due to any shortcoming on Dr. Reynolds' part.

192.   Dean Sattler also gave Ms. Gilfillan her cell phone number and direct line to reach her if there were any additional concerns.

193.   At the end of the Fall 2017 semester, Ms. Gilfillan was directed to meet with Dr. Tippett and Dr. Weaver.

194.   During that meeting, on December 7, 2017, Ms. Gilfillan was informed that she had raised her GPA to a 2.99, and, because her cumulative GPA remained under 3.0 and they had given her only one semester to raise it, she was being dismissed from the DPT program.

195.   Following that meeting, Ms. Gilfillan called Dean Sattler several times and left messages, but Dean Sattler never returned her calls.

196.   Ms. Gilfillan received written notification of her dismissal from the DPT program in a letter dated December 15, 2017.

197.   The letter noted that Ms. Gilfillan had received a fifth C, in Dr. Strubhar's class, and her GPA remained below 3.0.

198.   The letter also noted that Ms. Gilfillan had received a D in her fourth research class, taught by Dr. Reynolds and because courses with a D could not be counted towards program requirements, she would be unable to graduate and was being dismissed.

199.   Ms. Gilfillan was not provided with a second hearing with the Retention Committee prior to dismissal.

200.   Ironically, in keeping with BU's policy of providing students two semesters to raise their GPA, the BU graduate school registrar issued a letter on December 19, 2017 informing Ms. Gilfillan that she remained on probation and she had two semesters to raise her GPA.

201.   As a result of the cumulative actions by the Defendants, Ms. Gilfillan has suffered tremendously, physically, mentally, and emotionally, been damaged financially and her career has

been delayed by Defendants' wrongful acts.  Ms. Gilfillan has recently been diagnosed with Post-Traumatic Stress Disorder ("PTSD") as a result of Defendants' actions.

### FIRST CAUSE OF ACTION

***VIOLATIONS OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12182, et seq. and SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701, et seq.***
***(DISABILITY DISCRIMINATION INCLUDING FAILURE TO ACCOMMODATE)***

202.    Each of the allegations set forth in paragraphs 1 through 201, inclusive, are hereby incorporated by this reference as if realleged fully herein.

203.    That Ms. Gilfillan is a student with a disability.  Ms. Gilfillan suffers from ADHD, MDD, GAD, OCD and Fibromyalgia, which are qualifying disabilities.

204.    That Title III of the ADA provides, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

205.    The RA provides, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...."  29 U.S.C. § 794(a).  Because the language of these two provisions is substantially similar, claims under both acts are generally analyzed together.

206.    Title III of the ADA and the RA require covered entities to make reasonable modifications and accommodations unless such accommodations or modifications would fundamentally alter the nature of the services, privileges, advantages or accommodations provided by the entity.

207.    That BU is subject to the mandate of the ADA as an institution of public accommodation and receives federal financial assistance, as defined by 29 U.S.C. § 794, including through the receipt of federal student aid funds, and, as such, may not discriminate against a person because of her disabilities.

208.    That BU, and specifically the faculty of the DPT program, were aware of Ms. Gilfillan's disabilities and her disability related symptoms and need for accommodations to have an equal opportunity to participate in and benefit from BU's programs, including her need for additional time to complete tasks, her difficulty managing workloads in excess of other students, her need for time to attend medical appointments, her need to record or receive assistance in recording information, and her difficulty reading a large portion of text without text to speech or similar assistance.

209.    That BU discriminated against Ms. Gilfillan on the basis of her disability, including by denying her reasonable accommodations and modifications, in instances including, but not limited to, when:

a)      Ms. Gilfillan requested and was denied reasonable accommodations and modifications by CLA and later SAS, though these accommodations and modifications were necessary for her to have an equal opportunity to participate in and benefit from BU's programs and services.

b)      Ms. Gilfillan requested and was denied reasonable accommodations and modifications by the DPT program professors for assignments, practical exams, clinical experiences and other DPT program activities and services, though these accommodations and modifications were necessary for her to have an

equal opportunity to participate in and benefit from BU's programs and services.

c)      Ms. Gilfillan requested and was denied reasonable accommodations and modifications by the DPT program when remediating coursework and proposing courses of action to remediate her GPA, though these accommodations and modifications were necessary for her to have an equal opportunity to participate in and benefit from BU's programs and services.

d)      The DPT program failed to provide the reasonable accommodations and modifications approved by CLA and later SAS.

e)      Ms. Gilfillan was subject to hostility, negative treatment, and harsher judgment and grading than other students for requesting, making use of, or noting her need for accommodations.

f)      Ms. Gilfillan was subject to hostility, negative treatment, and harsher judgment and grading than other students on the basis of her disability, related symptoms, and/or related need for accommodations and modifications.

g)      Ms. Gilfillan was issued a warning for non-professional behavior for events directly related to her disability for which she should have received accommodations, including allowances for absences and tardies for treatment and disability related reasons and extended time to respond, and/or for events caused by BU's failure to provide such accommodations.

h)      The DPT program removed Ms. Gilfillan from her position as Class President on the basis of her disability, related symptoms, and/or related need for accommodations and modifications.

i)      The DPT program refused to permit Ms. Gilfillan to complete her initially assigned clinical experience and instead placed her in an objectively worse clinical site on the basis of her disability, related symptoms, and/or related need for accommodations and modifications.

j)      The DPT program subjected Ms. Gilfillan to additional work and academic sanction for Ms. Gilfillan's lower grades resulting directly from the DPT program's failure to provide reasonable accommodations and modifications.

k)      Dr. Reynolds failed to make adjustments to Ms. Gilfillan's research partnership to permit her the necessary accommodations and modifications, thereby hindering her ability to participate in and contribute to the research tasks and then refused to allow her to present the research at the national conference.

l)      The DPT program failed to make reasonable accommodations and modifications with respect to its policies and recommended course of action during the Retention Committee hearing, including but not limited to permitting Ms. Gilfillan to remediate her coursework over the summer, permitting Ms. Gilfillan to retake the deficient courses or permitting Ms. Gilfillan to utilize an extra year in the program to address the deficiencies.

m)      The DPT program gave certain faculty the impression that Ms. Gilfillan was required to do remediation over the summer of 2017, and that she "chose" not to do it, though Ms. Gilfillan had in fact asked to do remediation over the

summer and was denied, thereby further solidifying the faculty's hostility towards Ms. Gilfillan.

n)      The DPT program, and specifically Dr. Tippett, assumed that Ms. Gilfillan's disability was an obstacle that in and of itself would prevent her from successfully completing the program and becoming a physical therapist, and then punished Ms. Gilfillan because she did not agree with that view.

o)      The DPT program faculty derided Ms. Gilfillan's explanations of her disability, its impact, her needs and her ability to be successful if she could receive appropriate accommodations as deficiencies, excuses, a behavior to remedy, or a failure to take responsibility or be accountable.

210.    That BU's discriminatory actions were taken solely because of Ms. Gilfillan's disability, including her disability related symptoms and need for and use of accommodations.

211.    As a direct and proximate result of the unlawful discrimination against Ms. Gilfillan in violation of the ADA and the RA by BU, Ms. Gilfillan has suffered and continues to suffer damages academically, financially, and emotionally in an amount to be proven at trial.

212.    It has been necessary for Ms. Gilfillan to obtain the services of an attorney to prosecute this action, and Ms. Gilfillan is entitled to an award of attorney's fees and costs of suit incurred herein.

213.    Ms. Gilfillan is entitled to injunctive and declaratory relief to obtain readmission to BU's DPT program free from discrimination, and for an order forbidding BU from further perpetuating negative acts against her professionally, personally and academically, and from committing any other acts of discrimination.

///

## SECOND CAUSE OF ACTION

### *VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT 42 U.S.C. § 12203(a) and SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701, et seq.* **(RETALIATION)**

214.    Each of the allegations set forth in paragraphs 1 through 213, inclusive, are hereby incorporated by this reference as if realleged fully herein.

215.    That the ADA's retaliation statute provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The standard for retaliation claims under the RA is the same as the standard for retaliation claims under the ADA.

216.    That Ms. Gilfillan engaged in protected activity including but not limited to when she notified BU and the DPT faculty of her disabilities, she requested and gave notice to BU of her need for accommodations and modifications, she made use of her accommodations and modifications, and she advocated for her right to accommodations and modifications including adjustments to remediation schedules, deadlines, and other program policies and requirements.

217.    That Ms. Gilfillan was subjected to several adverse actions directly related to her requests for, need for, and use of accommodations and modifications and her advocacy for her rights, including but not limited to when:

    a)    The DPT program faculty refused to provide accommodations and then graded Ms. Gilfillan harshly or otherwise penalized her within the program for having asked.

    b)    The DPT program prevented her from participating in her matched clinical site, gave her an objectively worse clinical site and then penalized her

for the failings of the site, and removed her from her position as class president following her disclosure of her disabilities and request for accommodations.

c)     DPT program faculty increased her workload because she took disability related absences.

d)     DPT program faculty continually derided her commitment and ability, accused her of making excuses and failing to take responsibility, and shaming and humiliating her whenever she requested accommodations or discussed her need for or denial of those accommodations.

e)     The DPT program prevented her from presenting her research at the national conference because she had requested and required accommodations while performing the research project.

f)     The DPT program rejected her proposals to remediate her courses in a manner that accommodated her needs, refused to extend any deadlines in her courses, and penalized her for raising her need for and requesting accommodations.

g)     Ms. Gilfillan was dismissed from the DPT program without allowing her the procedures required under the program's policies.

218.    That there is a direct and causal connection between Ms. Gilfillan's protected activity and following mistreatment and hostility from BU's DPT faculty.

219.    That there is a direct and causal connection between Ms. Gilfillan's requests for accommodation and discussions of her disability, related need for accommodations and BU's failure to provide them and her mistreatment, given that the events happened closely together and

the threats, additional refusals to assist her and harsh treatment happened in response to or during discussions about her requests or need for accommodations.

220.    BU wrongly retaliated against Ms. Gilfillan, all in violation of her rights pursuant to the ADA and the RA, inflicting mental and emotional distress, and causing further damage to her health, well-being, academic and professional careers, because she is disabled.

221.    As a direct and proximate result of the unlawful retaliation against Ms. Gilfillan in violation of the ADA and the RA by BU, Ms. Gilfillan has suffered and continues to suffer damages academically, financially, and emotionally in an amount to be proven at trial.

222.    It has been necessary for Ms. Gilfillan to obtain the services of an attorney to prosecute this action, and Ms. Gilfillan is entitled to an award of attorney's fees and costs of suit incurred herein.

223.    Ms. Gilfillan is entitled to injunctive and declaratory relief to obtain readmission to BU's DPT program free from discrimination, and for an order forbidding all Defendants from further perpetuating negative acts against her professionally, personally and academically, and from committing any other acts of retaliation.

## THIRD CAUSE OF ACTION

### *BREACH OF CONTRACT*

224.    Each of the allegations set forth in paragraphs 1 through 223, inclusive, are hereby incorporated by this reference as if realleged fully herein.

225.    Ms. Gilfillan has an express and implied contract with BU in connection with the rights explicitly guaranteed by the BU Student Handbook, Graduate Catalog, DPT program policies and other material provided by BU to students.

226.    BU's Statement on Sexual Harassment and Discrimination in the BU Student Handbook provides that:

> Bradley University reaffirms the principle that its students, faculty, and staff have a right to be free from sexist and racist actions in the form of racial discrimination or sexual harassment by any member of the University community or by any unfair or inappropriate treatment accorded as a result of one's ethnicity, national origin, disability, age, gender, sexual orientation, unfavorable military discharge, military status or other basis that may be protected by applicable law.
>
> Bradley University does not tolerate such discrimination and harassment in the enlightened society in which it operates and will commit its efforts to educate its students and staff that the understanding of and sensitivity to these issues are paramount in the world both inside and outside the University.

227.    BU breached the contract with Ms. Gilfillan when it discriminated against her by failing to provide reasonable accommodations, accurately inform the faculty of the accommodations for which she was approved, and ensure that such accommodations were provided as required by the policy; and subjecting her to negative and unequal treatment, including through removing her as class president, changing her clinical site, penalizing her for requesting, seeking, utilizing, or discussing her need for accommodations or for the consequence of BU's failure to provide those accommodations.

228.    BU's Graduate School Dismissal Policy states that:

> Dismissal will be based only on a cumulative GPA of less than 3.0, not on particular letter grades. Students who have a GPA below 3.0 will be placed on academic probation and their tuition scholarships or graduate assistantships will be revoked. Students will then have two semesters in which to bring their GPA's back to 3.0 or higher.   Whether a student will be required to re-take a particular class will be left to the department's discretion. If the student did not reach the minimum 3.0 GPA after two semesters they will be dismissed.

229.    BU breached the contract with Ms. Gilfillan when it prevented her from taking advantage of the two semesters to which she was entitled to under the Academic Dismissal policy

to raise her GPA and the DPT program dismissed her after only a single semester because she had

failed to raise her GPA.

230.   The DPT program's Academic Dismissal policy as outlined in the Handbook

provides that a hearing with the Retention Committee will be scheduled for any student whose

cumulative GPA falls below 3.0 and that:

> Written notification will be sent by the Department Chair (Return Receipt
> Requested) to the student with regards to the purpose, date, time, and
> location of the hearing.  The letter of notification will also indicate the
> course of action that may be taken the Department faculty: 1) remediation,
> 2) retaking the course, 3) sitting out a year and retaking the course or
> repeating an entire semester, 4) recommend voluntary withdrawal, or 5)
> dismissal. At the hearing the student should be prepared to propose a course
> of action that would address the deficiency. As a result of the information
> presented at the hearing the Department faculty will decide whether the
> student should 1) remediate, 2) retake the course, 3) sit out a year and retake
> the course or repeat an entire semester, 4) voluntarily withdraw, or 5) be
> dismissed.

231.   The policy further provides that:

> A student on probation will be reviewed formally each semester by the
> Department's Graduate Student Retention Committee. If the student does
> not attain a 3.0 cumulative GPA while on probation the Department faculty
> will collectively discuss each student's case. A hearing will be scheduled
> for the student to meet with the Department's Graduate Student Retention
> Committee…Written notification will be sent by the Department Chair
> (Return Receipt Requested) to the student with regards to the purpose, date,
> time, and location of the hearing.  The letter of notification will also indicate
> the course of action that may be taken the Department faculty: (1)
> remediation, (2) retaking the course, (3) sitting out a year and retaking the
> course or repeating an entire semester, (4) recommend voluntary
> withdrawal, or (5) dismissal. At the hearing the student should be prepared
> to propose a course of action that would address the deficiency. As a result
> of the information presented at the hearing the Department faculty will
> decide whether the student should (1) remediate, (2) retake the course, (3)
> sit out a year and retake the course or repeat an entire semester, (4)
> voluntarily withdraw, or (5) be dismissed.

232.   BU breached the contract with Ms. Gilfillan when it failed to provide the required

notification prior to her hearing with the Retention Committee, refused to permit Ms. Gilfillan to

undertake any of the five options enumerated in the policy and actively prevented her efforts to do so, and prohibited Ms. Gilfillan from undertaking her scheduled clinical experience, though that is not a course of action permitted by the Academic Dismissal policy.

233.     BU further breached the contract with Ms. Gilfillan when it failed to provide Ms. Gilfillan with a second hearing before the Retention Committee prior to dismissing her from the DPT program.

234.     As a result of the breaches of contract committed against Ms. Gilfillan, she has been damaged as described above in an amount to be proven at trial.

235.     It has been necessary for Ms. Gilfillan to obtain the services of an attorney to prosecute this action, and Ms. Gilfillan is entitled to an award of attorney's fees and costs of suit incurred herein.

236.     Ms. Gilfillan is entitled to injunctive and declaratory relief to obtain readmission to BU's DPT program free from discrimination, and for an order forbidding all Defendants from further perpetuating negative acts against her professionally, personally and academically, and from committing any other breach.

## DEMAND FOR JURY TRIAL

Ms. Gilfillan hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for relief as follows:

1.     For general and compensatory damages in an amount to be determined at trial;

2.      For injunctive and declaratory relief described herein, as the Court deems appropriate;

3.      For pre-judgment and post-judgment interest, as provided by law;

4.      For the costs and disbursements of this action, including experts, and such other attorneys' fees, pursuant to 42 U.S.C. § 1988; and

5.      Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated this 10th day of August, 2018.

Respectfully Submitted,

**THE BACH LAW FIRM, LLC**

_  /s/ Jason J. Bach_
Jason J. Bach, Esq.
7881 West Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email: jbach@bachlawfirm.com
*Attorney for Plaintiff Grace Gilfillan*