UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| GRACE GILFILLAN,<br><br>    Plaintiff,<br><br>v.<br><br>BRADLEY UNIVERSITY,<br><br>    Defendant. | Case No. 18-1297-MMM |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Bradley University's Motion for Summary Judgment. D. 13[1]. For the reasons stated herein, Defendant's Motion is GRANTED IN PART AND DENIED IN PART. Defendant's Motion is GRANTED in that Plaintiff fails to adduce sufficient evidence for her federal civil rights claims to proceed to trial. Because the claims over which the Court has original jurisdiction are dismissed, the Court relinquishes jurisdiction over Plaintiff's state law claim and Defendant's Motion on the claim is DENIED AS MOOT. All pending pretrial trial and trial dates are VACATED, and the Clerk of Court is directed to close this case.

### JURISDICTION

The Court has federal question jurisdiction over this matter under 28 U.S.C. § 1331, as Plaintiff's claims arise under Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12182, and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et. seq*. The Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367(a).

---

[1] Citations to the underlying docket are abbreviated as "D. __."

Venue in this Court is appropriate under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims occurred in Peoria, Illinois.

## BACKGROUND

In 2015, Plaintiff Grace Gilfillan was accepted into the Doctor of Physical Therapy ("DPT") program at Bradley University. D. 24, ¶ 1. Prior to enrolling at Bradley, Plaintiff earned an associate degree from Illinois Central College and a bachelor's degree from Western Illinois University. *Id.* One of the goals of the DPT program is to prepare graduate students to serve as physical therapist autonomous practitioners. *Id.* ¶ 3. As such, the program has stringent academic requirements. One of those requirements is that a student cannot earn a grade lower than "C" in any of her classes. D. 14-2 at 21. If she does, the program handbook calls for dismissal of the student. D. 24, ¶ 5. The program is designed for a class cohort to participate in a three-year preplanned curriculum as a group. *Id.* ¶ 12. Plaintiff's cohort began in June 2015. D. 7, ¶ 15.

<u>Plaintiff's Disabilities</u>

In April 2016, with a summer session and fall semester behind her, Plaintiff approached one of her professors concerning treatment options for her disabilities. Pl.'s Dep. at 42.[2] Plaintiff, who suffered from depression, had become increasingly depressed and was experiencing suicidal ideation, which affected her ability to perform academically. *Id.* at 73-74. Plaintiff had last been diagnosed with Major Depressive Disorder ("MDD") by a Bradley physician in July 2015. D. 14-2 at 124. A month earlier, she began seeing a school psychologist at the university. Pl.'s Dep. at 74. Plaintiff took prescribed medication for her depression. D. 14-2 at 124.

---

[2] Plaintiff's deposition appears, in its entirety, in D. 14-1 at 4-53.

Accommodations

On April 12, 2016, in response to her request for assistance, Plaintiff's professor emailed Plaintiff information about requesting accommodations at the university. D. 14-2 at 119. Shortly thereafter, Plaintiff formally requested the following accommodations: assistance with notetaking, permission to audio record lectures, extended deadlines (if possible), and a quiet environment and extended time for testing. *Id.* at 126, 128. On May 2, 2016, Plaintiff emailed several of her professors informing them of her MDD diagnosis, along with the diagnoses of other disabilities, and requested they grant her incompletes in four of her Spring 2016 semester courses so that she could pursue more intensive treatment for her depression. D. 24, ¶ 22.

In response, Plaintiff was granted additional time, after the end of the semester, to complete her course requirements. Pl.'s Dep. at 45. Plaintiff alleges she also requested accommodations for her Summer 2016 clinical rotation, in late March of 2016, but she fails to provide substantiation for that request outside of her own testimony. D. 14-2 at 95. Additionally, the professor who oversaw Plaintiff's clinical rotations recalls no such request. D. 25 at 22. Clinical rotations at the university were graded on a pass/fail basis, D. 15-1 at 25, and Plaintiff passed her Summer 2016 clinical rotation without accommodations. *Id.* at 108.

After Plaintiff's Summer 2016 clinical rotation, the university enacted its student accommodations procedure, which was to send notice of a student's approved accommodations to the student's professors each semester. D. 29, ¶ 35. Professors receiving notice were expected to implement the accommodations, as there were no optional accommodations. *Id.* ¶ 36.

For the Fall 2016 semester, Plaintiff's academic accommodations included double time for exams/assessments, exams/assessments in an auditory format, and the ability to record lectures with a smart pen. D. 20-3 at 86-87. For reasons not discernable from the record, Plaintiff was

3

forced to notify her professors of her approved accommodations toward the end of September 2016, as opposed to the university providing notice. *Id.* at 89-90.

For the Spring 2017 semester, the university sent out a timely notice of accommodations on Plaintiff's behalf. D. 25 at 48-49. The approved accommodations for that semester included double time for exams/assessments, a distraction-reduced exam environment, and the ability to record lectures. *Id.* at 48.

Prior to the Fall 2017 semester, Plaintiff requested extended deadlines for assignments, in addition to her previous accommodations. D. 24, ¶ 99. Plaintiff was granted the accommodation of extended deadlines for assignments with faculty approval, listed as "[e]xtra time for assignments w/ prof[essor] approval. Student may request additional time for completion of assignments from professor." D. 21-1 at 96. Plaintiff contends this was an accommodation for extended deadlines on all assignments regardless of approval. D. 24, ¶ 101. On August 29, 2017, notice of Plaintiff's approved accommodations for the Fall 2017 semester was sent to her professors. D. 21-1 at 96-97. The accommodations included e-textbooks, extended time on tests in a distraction-reduced environment, and notetaking services, which included the use of a smart pen. *Id.*

<u>Struggles and Symptoms</u>

Plaintiff had a number of serious setbacks that prevented her from continuing in Bradley's DPT program. As mentioned earlier, Plaintiff took four incompletes during her Spring 2016 semester. She was required to make up work for those courses over the summer of 2016. During Plaintiff's Summer 2016 clinical rotation, Plaintiff's clinical instructor notified the director of clinical education that there were concerns with her performance. D. 25-1 at 76. Those concerns included Plaintiff coming to work unprepared, struggling with patient evaluation and treatments, needing constant supervision when working with patients, and tardiness. *Id.* at 77. Plaintiff passed

4

the clinical rotation, but her performance left the director questioning Plaintiff's abilities. *Id.* at 106, 110.

In June 2016, Plaintiff informed her therapist that she was avoiding school work. D. 14-2 at 141. Plaintiff disclosed she had completed only a fraction of the required work that she needed to and that she waited too long to get started. *Id.* at 143. Plaintiff also surmised that she might be unable to start her summer clinical with her cohort, which would lead to her graduating after the group. *Id.* Around the same time, Plaintiff informed her psychiatrist that she was still struggling with procrastination. *Id.* at 145. Plaintiff also told her therapist she was tired all of the time and that all she wanted to do was eat and sleep. *Id.* at 147.

On January 12, 2017, the university sent Plaintiff a letter explaining that she was considered to be of "Academic Concern" because she received a "C" in PT 740: Clinical Science III. D. 15-1 at 89. The letter went on to state that her performance was especially concerning, as Plaintiff received a prior "C" in PT 662: Neurological Physical Therapy. *Id.* The letter informed Plaintiff she would need to perform remediation work for the course during the 2017 spring semester. *Id.* On January 17, 2017, Plaintiff reported to her therapist that she was frustrated with herself because of her behavioral patterns. *Id.* at 2. She also reported that she felt like she was behind before even starting because she procrastinated on some research and getting her office ready. *Id.*

On February 3, 2017, Plaintiff emailed two of her professors stating that she would be late for class that morning because she had to drop off her cat for surgery. *Id.* at 77. On March 28, 2017, Plaintiff's therapist noted that Plaintiff decided to discontinue almost all of the psychotropic medications she was taking, and that Plaintiff was frustrated that she could not concentrate or listen during lectures. *Id.* at 3.

5

On April 16, 2017, Plaintiff sent an email to one of her professors explaining why she was unprepared for his extemporaneous request for an oral explanation of her homework assignment. D. 15-1 at 27.  In his reply, the professor emphasized he was there to help Plaintiff be successful. *Id.* He went on to explain that Plaintiff was tardy for class and sleeping through her alarm was not an excuse. *Id.*  The professor warned that nonprofessional behavior, such as tardiness, leaving abruptly, and consistent absences were not acceptable in the profession of a physical therapist and could lead to substandard practice, patient safety risks, and employee dismissal. *Id.*  He urged Plaintiff to do everything in her power to be in attendance for the entire class period for the remainder of the semester. *Id.*  In conclusion, the professor advised Plaintiff to take ownership and responsibility for finishing the semester stronger than she had demonstrated.  *Id.* at 28.  He ended the correspondence telling Plaintiff he believed in her, and that he, and others, were there to help. *Id.*

On April 20, 2017, Plaintiff was "placed on warning" by the university for nonprofessional behavior.  D. 15-1 at 90.  In response to the warning, Plaintiff composed a letter, which stated, in part, "I acknowledge specific concerns regarding missed class periods, missed meetings outside of class (research) and lack of timely attention to answering emails." *Id.* at 60.  The letter went on to state, "I recognize that I must make adjustments to my current behavior patterns in order to avoid necessity of future remediation, a step-out from the program or the possibility of dismissal." *Id.* Plaintiff attached a signed copy of the non-professional behavior student notification form to her letter. *Id.* at 61.

After the end of her 2017 spring semester, the university placed Plaintiff on academic probation, as her cumulative grade point average had dropped below a 3.0.  D. 15-1 at 96.  In a letter dated May 18, 2017, Plaintiff was informed that while she would normally have two

consecutive semesters to raise her cumulative GPA up to a 3.0, she would only have one semester left to raise her GPA since the 2018 spring semester was comprised of clinical education based on a pass/fail grading system. *Id.* at 98. The letter also indicated, as a result of her academic probation, program faculty had determined that Plaintiff would not be allowed to participate in a required clinical rotation that summer. *Id.* The letter reiterated that Plaintiff would not be able to graduate if she remained on academic probation. *Id.*

Dismissal

On December 15, 2017, the chair of the DPT program wrote Plaintiff to inform her that she was being dismissed from the program. D. 15-1 at 82. The letter indicated *inter alia* that since she received a grade of "D" in PT 816: Supervised Research IV, she had not satisfied the program's degree requirements. *Id.* The letter also stated that since May 18, 2017, Plaintiff was on notice that she would have only one remaining semester to bring her GPA up to a 3.0, since the 2018 spring semester would be graded pass/fail only. *Id.* The chair reminded Plaintiff that she was previously informed she would be unable to graduate if she remained on academic probation. *Id.*

The letter also indicated that Plaintiff had earned her fifth "C" in a course during the 2017 fall semester and that she remained on academic probation. *Id.* Because Plaintiff had unsuccessfully performed her didactic work, she would be unable to participate in a final clinical rotation the last semester. *Id.* The chair added that program faculty had continued to note ongoing non-academic issues with Plaintiff, including the lack of timely communication, incomplete and/or missed assignments, and issues regarding time management and task prioritization skills. *Id.* The letter concluded by informing Plaintiff, that based on the consensus of the program's core faculty, she was dismissed from the program. *Id.*

## PROCEDURAL HISTORY

On August 10, 2018, Plaintiff filed her amended complaint, alleging Defendant violated the Americans with Disabilities Act, 42 U.S.C. §§ 12182, 12203(a) ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* ("Rehabilitation Act"), by failing to grant reasonable accommodations for her disabilities and through various acts of retaliation. D. 3 at 27-34. In addition to her civil rights claims, Plaintiff also brought suit under Illinois law for breach of contract. *Id.* at 34-37. On February 28, 2020, Defendant filed its Motion for Summary Judgment. D. 13. On April 3, 2020, Plaintiff filed her response. D. 24. On April 17, 2020, Defendant filed its reply. D. 29. This Order follows.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). "In deciding motions for summary judgment, courts must consider the evidence as a whole," *de Lima Silva v. Dep't of Corrs.*, 917 F.3d 546, 559 (7th Cir. 2019), and "view[ ] the record and all reasonable inferences . . . drawn from it in the light most favorable to the nonmoving party," *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018). However, the court will not draw inferences that are supported by only speculation or conjecture, *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008), and conclusory allegations alone cannot defeat a motion for summary judgment, *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. "It is not the role of the [c]ourt to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment." *Aberman v. Bd. of Educ. of City of Chi.*, 242 F. Supp. 3d 672, 685 (N.D. Ill. 2017) (citing *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008)). Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 646 (7th Cir. 2011). The existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *Anderson*, 477 U.S. at 252.

## DISCUSSION

In its Motion for Summary Judgment, Defendant raises multiple reasons why judgment should be entered in its favor. D. 13 at 8-13. Specifically, Defendant argues it is entitled to judgment as a matter of law because (i) Plaintiff was provided all the accommodations to which she was entitled; (ii) Plaintiff was not "otherwise qualified," as she failed to meet the academic standards of the program without reasonable accommodations; and (iii) Plaintiff fails to proffer sufficient evidence of intentional discrimination or of conduct motivated by retaliatory animus for the case to proceed to trial. *Id.* at 8. Defendant also provides argumentation addressing Plaintiff's breach of contract claim, but for the reasons stated below, that claim is dismissed. The Court addresses Defendant's arguments in the order of their dispositive effect on the remainder of Plaintiff's claims.

## I.  Disability Discrimination

The Rehabilitation Act precludes federal grantees from excluding, denying benefits to, or discriminating against any "otherwise qualified individual . . . solely by reason of her or his disability." 29 U.S.C. § 794(a).  Title III of the ADA provides, in relevant part, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U.S.C. § 12182(a).  The ADA goes on to define "discrimination" as including "a failure to make reasonable modifications" that are "necessary" to provide a disabled individual with such full and equal enjoyment, "unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."  *Id.* § 12182(b)(2)(A)(ii).  Under the Rehabilitation Act, "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985).  The Supreme Court has interpreted this to mean that federally funded programs are required to make reasonable accommodations when necessary to assure meaningful access. *Id.*

It is well-established that the ADA and Rehabilitation Act are similar in purpose and scope. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997).  The Seventh Circuit has declared that the discrimination provisions and regulations of both statutes are "materially identical" and "coextensive." *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018); *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir. 1999).  Accordingly, to set forth a prima facie case of discrimination under either statute, a plaintiff must establish: (i) she suffers from a disability; (ii) she is otherwise qualified to participate in the defendant's program; and (iii) she was excluded from the program on the basis of her

disability. *Khan v. Midwestern Univ.*, 879 F.3d 838, 843 (7th Cir. 2018), *as amended on denial of reh'g* (Feb. 26, 2018). The Rehabilitation Act further requires that a plaintiff show that the program in which she was involved received federal financial assistance. 29 U.S.C. § 794(a); *Novak v. Bd. of Trs. of S. Ill. Univ.*, 777 F.3d 966, 974 (7th Cir. 2015).

Defendant admits it is an institution of public accommodation and that it receives federal financial assistance. D. 7, ¶ 207 at 45. It also concedes that Plaintiff suffers from disabilities, as it acknowledges she was granted certain accommodations in the DPT program. D. 13, ¶¶ 17-18 at 5-6. Defendant argues, however, that Plaintiff fails to demonstrate that she was "otherwise qualified" to participate in its program. *Id.* at 8-10. To be "otherwise qualified" for the program, Defendant observes, Plaintiff had to be able to meet all of its requirements in spite of her disability, with or without reasonable accommodation. *Id.* at 10. Defendant argues Plaintiff fails to demonstrate she was qualified for the program because the faculty made the academic decision to dismiss her. *Id.* Defendant asserts that academic decisions should not be overridden by the Court unless there is a showing of a substantial departure from academic norms. *Id.*

In response, Plaintiff argues the determination of whether an individual is "otherwise qualified" must consider the individual's ability to meet eligibility criteria for a program when provided with accommodations. D. 24 at 33. She also argues the ultimate question in the determination is the extent to which an academic institution is required to make reasonable modifications to its programs for the needs of the handicapped. *Id.* Plaintiff concludes that had Defendant fulfilled its statutory obligations for accommodations, she would have maintained the grades necessary to remain in the program and would not have struggled in her courses to the extent that she did. *Id.* at 34.

**A. Plaintiff Fails to Demonstrate she was "Otherwise Qualified"**

The Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794(a).  Title III of the ADA does not expressly articulate an "otherwise qualified" standard.  *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006).  "Basic qualifications come into play, however, when the context is that of post-secondary education."  *Id.*

A plaintiff asserting a violation of the ADA or Rehabilitation Act bears the burden in establishing she is qualified.  *Tyndall v. Nat'l Educ. Ctrs., Inc.,* 31 F.3d 209, 213 (4th Cir.1994).  To determine whether a plaintiff has satisfied this burden, a court must decide whether she has presented sufficient evidence to show (1) that she could satisfy the essential eligibility requirements of the program, and (2) if not, whether any reasonable accommodation by the program would enable the plaintiff to meet these requirements.  *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012).

In *Halpern v. Wake Forest University Health Sciences*, 669 F.3d 454 (4th Cir. 2012), the Fourth Circuit issued guidelines for what constitutes a "reasonable accommodation."  It observed:

> A modification is not reasonable if it either imposes undue financial and administrative burdens . . . or requires a fundamental alteration in the nature of the program. A modification to an essential aspect of the program constitutes a fundamental alteration and, therefore, is an unreasonable accommodation. Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is reasonable on its face[.]

*Halpern*, 669 F.3d at 464 (internal quotation marks and citations omitted).

Other circuit court of appeals have addressed reasonable accommodations, as well.  In *Mershon v. St. Louis University*, 442 F.3d 1069 (8th Cir. 2006), the Eight Circuit concluded:

> It is beyond question that it would fundamentally alter the nature of a graduate program to require the admission of a disabled student who cannot, with reasonable accommodations, otherwise meet the academic standards of the program. An educational institution is not required by the Rehabilitation Act or the ADA to lower its academic standards for a professional degree.

*Mershon*, 442 F.3d at 1076.

When the accommodation involves an academic decision, courts are instructed to show great respect for the faculty's professional judgment.  *See Amir v. St. Louis Univ.*, 184 F.3d 1017, 1029 (8th Cir. 1999) ("We will not invade a university's province concerning academic matters in the absence of compelling evidence that the academic policy is a pretext for discrimination."). Courts have also been directed to be mindful that academic judgments often rest on subjective assessments about academic potential.  *Novak*, 777 F.3d at 976.  Academic decisions are given so much deference that a court may not override the decision unless it is such a substantial departure from accepted academic norms as to demonstrate that the committee responsible did not actually exercise professional judgment.  *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985).

Plaintiff concedes she could not satisfy the essential eligibility requirements of the DPT program without reasonable accommodations.  D. 24 at 37.  Yet, she asserts she would have met the requirements with consistent application of additional accommodations, *id.* at 33, including completing the program outside of three years, Pl.'s Dep. at 63; note-taking assistance, D. 14-2 at 126, 128; extended time on all testing, *id.*; completing coursework past semester deadlines, *id.* at 126; taking course incompletes, *id.*; and academic coaching, D. 14-2 at 128; among others.

The Court finds, however, that Plaintiff was provided many of the accommodations she requested, as the record is replete with examples of extensions of time to complete assignments,

D. 25 at 30, 71; additional time for testing, *id.* at 72; the ability to start coursework months early, *id.* at 76; switching academic advisors, *id.* at 69; audio devices to record class lectures, *id.*; and taking incompletes in four 2016 spring semester classes and making up the coursework after the semester ended, Pl.'s Dep. at 45. The record also demonstrates Plaintiff was given countless opportunities to alter her academic performance and non-professional behaviors for which she was repeatedly warned could result in her dismissal.

While the university ultimately made the decision to dismiss Plaintiff, its decision was nearly a year and a half after she was granted accommodations to help her succeed. Even with the accommodations, however, Plaintiff was unable to meet the requisite professional and academic standards to remain in the program. Plaintiff's own exhibits provide a window into her struggles. She repeatedly earned the lowest grades in some of her courses, D. 25 at 52, 78, earning "C's" in five classes and a "D" in another, *id.* at 69; habitually missed classes, clinicals, and meetings, *id.* at 52-54, 74, 76; received warnings for academic performance and nonprofessional behavior, *id.* at 55, 57; was placed on academic probation, *id.* at 69; received complaints from classmates and observations from faculty that she failed to contribute to group projects, *id.* at 74, 76; and demonstrated incidents of procrastination and an overall lack of preparedness, *id.* at 76.

The essential eligibility requirements of the DPT program (i.e., minimum 3.0 GPA, no grades below "C", a three-year preplanned curriculum, timeliness, professionalism, etc.) were clearly delineated before Plaintiff arrived on campus. Those standards were reinforced in handbooks, letters, emails, meetings, and direct conversations. Plaintiff was given repeated attempts, and reasonable accommodations, to meet the program's realistic standards. While the Court acknowledges the serious ramifications of her dismissal, Plaintiff fails to demonstrate—by a large margin—she was otherwise qualified to maintain enrollment in the program, even with the

14

accommodations she was granted. Plaintiff also fails to present evidence from which a factfinder could infer that the denial of additional accommodations was unreasonable or that the faculty displayed academic judgment that was a substantial departure from accepted academic norms. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's claim of disability discrimination vis-à-vis a failure to accommodate is GRANTED, and the claim is DISMISSED.

## II.     Retaliation

Defendant also argues Plaintiff's retaliation claims are essentially the same as her discrimination claims. D. 13 at 12. It asserts Plaintiff fares no better on the allegations simply by characterizing the university's conduct as retaliatory. *Id.* Defendant argues that Plaintiff fails to proffer any direct or circumstantial evidence of retaliatory animus for a jury to consider, and it asserts that her unsupported perceptions and opinions cannot supplant such evidence. *Id.*

In response, Plaintiff argues the university concedes that she engaged in protected activity by requesting reasonable accommodations and advocating for herself. D. 24 at 48. Plaintiff asserts there is also sufficient evidence that she suffered adverse actions, including a change in her clinical placement, removal as class president, hostility from faculty including accusations of unprofessional behavior and lack of accountability, non-academic warnings, and dismissal. *Id.* Plaintiff concludes there is sufficient evidence of a causal connection between her protected activity and the adverse actions from which she suffered, such that a jury could conclude she was the victim of unlawful retaliation. *Id.* The Court disagrees.

### A.  Plaintiff Fails to Demonstrate Pretext

The ADA prohibits discrimination against any individual who has opposed an unlawful act of discrimination, made a charge of discrimination, or participated in any manner in an investigation or proceeding under the Act. 42 U.S.C. § 12203(a). To establish a prima facie case

of retaliation and survive summary judgment, a plaintiff must demonstrate that (1) she engaged in statutorily protected activity, (2) an adverse action was taken against her, and (3) there is a causal connection between the adverse action and the protected activity." *Amir,* 184 F.3d at 1025; *Mayers v. Laborers' Health and Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C. Cir. 2007). The same test applies under the Rehabilitation Act. *Mayers*, 478 F.3d at 369. Claims for retaliation are analyzed under the same burden-shifting framework established for Title VII cases. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *Mershon*, 442 F.3d at 1074-75.

Once a plaintiff establishes a prima facie case, "the burden then shifts to the defendant to proffer a legitimate nondiscriminatory reason for the adverse action." *Amir*, 184 F.3d at 1025–26 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993)). "Once the defendant establishes a legitimate nondiscriminatory reason for the adverse action, the burden of production then shifts back to the plaintiff to show that the defendant's reason is a pretext for discrimination." *Amir*, 184 F.3d at 1026. "The ultimate burden of persuasion rests with the plaintiff at all points throughout the analysis." *Id.*

Assuming arguendo that Plaintiff has demonstrated her requests for accommodations were statutorily protected and that adverse actions were taken against her; Plaintiff fails to adduce sufficient evidence that demonstrates the university's reasons for those actions were connected to her requests for accommodations or were pretext for discrimination. It is clear from meeting minutes, emails, letters, internal memorandum, etc., *see, e.g.,* D. 25 at 52-58, 66-67, 69-79; D. 25-1 at 39-40, 42-49; D. 15-1 at 58-60, 90, 96-99, that the university made the difficult decision to dismiss Plaintiff because of non-professional behavior, substandard academic performance, failing to maintain a 3.0 GPA, and for earning a "D" in PT 816: Supervised Research. The Supreme Court has noted in the context of Title VII that "a reason cannot be proved to be 'a pretext

for *discrimination'* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks,* 509 U.S. at 515. Put differently, it is not enough to disbelieve the defendant; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 519.

Plaintiff fails to set forth sufficient evidence for a jury to determine that the university's reasons for her dismissal were false and that discrimination—or her requests for accommodations—was the real reason she was dismissed from the program. Plaintiff only offers misconstrued faculty action, personal assumptions, and conclusory allegations to support her claim of retaliation. This evidence, taken in the context of the complete record, is insufficient to survive summary judgment. *Anderson*, 477 U.S. at 252; *Christ Hosp. & Med. Ctr.*, 328 F.3d at 892. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's claim of disability discrimination vis-à-vis retaliation is GRANTED, and the claim is DISMISSED.

### III.    Illinois Breach of Contract Claim

In *RWJ Management Co., Inc. v. BP Products North America, Inc.*, 672 F.3d 476 (7th Cir. 2012), the Seventh Circuit addressed the rebuttable presumption that "when all federal claims in a suit in federal court are dismissed before trial, . . . the court will relinquish federal jurisdiction over any supplement state-law claims." It observed:

> We have identified certain circumstances that may displace the presumption, namely: (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided. The district court's evaluation of these case-specific factors is entitled to substantial deference; we will reverse a district court's decision to relinquish supplemental jurisdiction only in extraordinary circumstances.

*RWJ Mgmt. Co.*, 672 F.3d at 479-80 (internal quotation marks and citations omitted).

Here, all three factors weigh in favor of relinquishing jurisdiction. The statute of limitations has not run on Plaintiff's breach of contract claims. The supplemental jurisdiction statute provides, in part, "The period of limitations for any [state] claim [joined with a claim within federal-court competence] shall be tolled while the claim is pending [in federal court] and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d); *Artis v. D.C.*, 138 S. Ct. 594, 598 (2018). The Supreme Court has interpreted "tolling" in the supplemental jurisdiction statute to mean "to hold it in abeyance, *i.e.*, to stop the clock." *Artis*, 138 S. Ct. at 598. On December 15, 2017, Plaintiff was dismissed from the DPT program at Bradley University, and she filed her amended complaint with this Court on August 10, 2018. In Illinois, the statute of limitations for a violation of a written contract is ten years. 735 Ill. Comp. Stat. Ann. 5/13-206 (West 2007). The statute of limitations for a violation of an implied contract is five years. 735 Ill. Comp. Stat. Ann. 5/13-205 (West 2012). Therefore, if so desired, Plaintiff has more than ample time to file her dismissed claim in state court.

Additionally, substantial judicial resources have not already been committed to Plaintiff's breach of contract claim so that sending the case to another court would cause a substantial duplication of effort. Plaintiff's claim has been pending in this Court for under two years and the majority of discovery conducted in this action predominately concerned Plaintiff's federal claims. The Court has committed minimal judicial resources to the action other than to approve proposed discovery deadlines, reset final pretrial and trial dates, and rule on Defendant's summary judgment motion. As such, requiring Plaintiff to file her breach of contract claim in state court would not cause a substantial duplication of judicial effort.

Finally, it is not absolutely clear how Plaintiff's pendent claim can be decided. While Plaintiff's federal civil rights claims were fairly straightforward, her breach of contract claim is

more complex. *See* D. 3, ¶¶ 224-34.  Plaintiff alleges Defendant violated both express and implied contracts in connection with rights explicitly guaranteed by materials provided to students. *Id.* ¶ 225.  She also outlines contradictory language in the program's dismissal policy, *id.* ¶ 228, and may assert claims for procedures outlined in materials which she did not receive, *id.* ¶¶ 230-31.  Illinois courts have recognized the nuances inherent in such claims. *See Bosch v. NorthShore Univ. Health Sys.*, 2019 IL App (1st) 190070, ¶ 31 (observing that while traditional contract actions entail pointing to particular contract provisions, a breach of an implied private school contract might consist of nothing more than a claim that the student paid tuition, satisfactorily performed coursework, and was wrongly denied advancement toward that degree).  The Court leaves it to the state courts to best interpret Illinois law.  Accordingly, supplemental jurisdiction over Plaintiff's breach of contract claim is relinquished, and the claim is DISMISSED.

## CONCLUSION

Defendant's [13] Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.  Defendant's Motion is GRANTED in that Plaintiff fails to adduce sufficient evidence for her federal civil rights claims to proceed to trial.  Because the claims over which the Court has original jurisdiction are DISMISSED, the Court relinquishes jurisdiction over Plaintiff's state law claim and Defendant's Motion on that claim is DENIED AS MOOT.  All pending pretrial and trial dates are HEREBY VACATED, and the Clerk of Court is directed to close this case.

Entered on May 19, 2020.                     /s/ Michael M. Mihm
                                             Michael M. Mihm
                                             United States District Judge